Thomas TATE, Appellant
(Plaintiff Below),

v.

SECURA INSURANCE, a Mutual
Company Appellee (Defendant
Below).

No. 49S02–9202–CV–135.

Supreme Court of Indiana.

Feb. 28, 1992.

W.F. Conour, Rex E. Baker, Conour Doehrman, Indianapolis, for appellant.

Steven H. Frank, Carter & Leerkamp, Indianapolis, for appellee.

DICKSON, Justice.

Plaintiff-appellant Thomas Tate seeks transfer to this Court following the decision of the Court of Appeals affirming summary judgment for Secura Insurance, A Mutual Company, the defendant-appellee, as to the interpretation to be given an automobile insurance policy providing underinsured motorists coverage. *Tate v. Secura Insurance* (1990), Ind.App., 561 N.E.2d 814.

Tate was seriously injured as he was providing assistance to a car stalled in the parking lane of an Indianapolis street when it was struck by a vehicle operated by an intoxicated driver. Tate settled with the driver's insurance company for $50,000, the maximum payable under the driver's bodily injury liability coverage. With alleged preliminary medical expenses already in excess of $60,000, past and future income losses, permanent impairment, and the possibility of future amputation, Tate claimed that the reasonable value of his total damages was in excess of $100,000 and asserted a claim under the underinsured motorists provision of his own automobile insurance policy with Secura, which denied the claim. Tate's law suit for breach of contract ensued, resulting in summary judgment in favor of Secura, and the Court of Appeals affirmed. We now grant Tate's petition for transfer.

Secura contends, and we agree, that the summary judgment should be affirmed if the trial court was correct upon any one of the of the following potentially dispositive issues:

1. whether Tate is entitled to receive up to $50,000 under his Secura underinsured motorists coverage with $50,000 limits where his total damages exceed the tortfeasor's $50,000 bodily injury liability insurance limits;

2. whether Tate's claim is precluded for failure to comply with the provisions requiring exhaustion of applicable bodily injury liability insurance; and

3. whether Tate's claim is precluded for failure to obtain Secura's consent to his settlement with the underinsured driver.

Arguing that summary judgment in favor of Secura is improper on each of these questions, Tate presents an additional issue regarding the affidavit of an expert witness, which we will not address due to our resolution of the dispositive issues.

**1.** Except where otherwise indicated, emphasized words or phrases within insurance policy passages quoted in this opinion were italicized in

*1. Do Tate's limits preclude his claim?*

Tate contends that when the total damages to an insured person exceed the tortfeasor's liability limits, the amount of recovery under his underinsured motorists coverage is the full amount of damages sustained less the tortfeasor's liability limits already received, or the limits of the underinsured motorists coverage, whichever is less. Secura contends that where, as here, the tortfeasor's liability insurance limits are equal to those of its policyholder's underinsured motorists coverage, the reduction provisions of the policy preclude payment.

The following policy provisions [1] are pertinent to this issue:

PART III—UNINSURED MOTORISTS COVERAGE AND UNDERINSURED MOTORISTS COVERAGE

\* \* \* \* \* \*

COVERAGE C–2 UNDERINSURED MOTORISTS COVERAGE

We will pay damages which an *insured person* is legally entitled to recover from the owner or operator of an *underinsured motor vehicle* because of *bodily injury* sustained by an *insured person* and caused by an accident.

\* \* \* \* \* \*

ADDITIONAL PROVISIONS APPLICABLE TO PART III ONLY

\* \* \* \* \* \*

A. Definitions
   As used in this part:

\* \* \* \* \* \*

3. *"Underinsured motor vehicle"* means a land motor vehicle or trailer, which is insured by a liability policy or bond at the time of the accident which provides *bodily injury* liability limits less than the amount of total damages an *insured person* is legally entitled to recover but which are uncompensated because the damages exceed those limits.

\* \* \* \* \* \*

the policy to designate terms expressly defined in the insurance contract.

D. Reductions in the Amounts Payable
Amounts payable will be reduced by:
1. Amounts paid because of the *bodily injury* by, or on behalf of, persons or organizations who may be legally responsible.

Record at 10–11. The declaration page of the policy specified that Tate's limit of liability for underinsured motorists coverage was $50,000 per person. Record at 146.

■ The interpretation of an insurance policy, as with other contracts, is primarily a question of law for the court, even if the policy contains an ambiguity needing resolution. *Eli Lilly & Co. v. Home Insurance Co.* (1985), Ind., 482 N.E.2d 467, *cert. denied*, 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990. It is only where a contract is ambiguous and its interpretation requires extrinsic evidence that the fact finder must determine the facts upon which the contract rests. *Kordick v. Merchants Nat'l Bank and Trust Co.* (1986), Ind.App., 496 N.E.2d 119; *Wilson, Adm'x v. Kauffman* (1973), 156 Ind.App. 307, 296 N.E.2d 432. If insurance policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Spears v. Jackson* (1980), Ind.App., 398 N.E.2d 718. If there is an ambiguity, the policy should be interpreted most favorably to the insured. *Miller v. Dilts* (1984), Ind., 463 N.E.2d 257. It should be construed to further the policy's basic purpose of indemnity, *Eli Lilly*, 482 N.E.2d 467.

■ The Court of Appeals correctly identifies the focus of the controversy to be the section of the policy in Part III entitled "D. Reductions in the Amounts Payable," which provides in pertinent part that "[a]mounts payable will be reduced by ... [a]mounts paid" to the insured by or on behalf of the tortfeasor. The parties dispute the meaning to be given "amounts payable," a phrase not expressly defined in the policy. The Court of Appeals majority declares that it "unambiguously refers to the policy limits of $50,000." 561 N.E.2d at 818, and thus it is Tate's coverage limits which must be reduced by the amounts paid from the tortfeasor to determine whether he is entitled to payment. The

dissent, although likewise declaring this provision "unambiguous," asserts that the phrase means the "amount of bodily injuries Tate is entitled to recover from the tortfeasor," and concludes that "in plain words" the contract provides underinsured motorists coverage for bodily injury damages to the extent they exceed the tortfeasor's liability coverage, up to Tate's limits for this coverage. 561 N.E.2d at 820.

This issue must be resolved against Secura. By failing to clearly express a contrary meaning, Secura is bound by the plain and ordinary meaning of its words as viewed from the standpoint of the insured. We find the phrase "amounts payable" to refer to the initial insuring agreement for Coverage C–2 Underinsured Motorists Coverage wherein Secura promises to pay such bodily injury damages as its insured is legally entitled to recover from the operator of an underinsured motor vehicle. It is this amount of damages, not the coverage limit, which is the "amounts payable" to be reduced by the amount paid to Tate by or on behalf of the tortfeasor.

■ This result is also supported by Secura's definition of "underinsured motor vehicle" as one whose applicable bodily injury liability coverage is less than the "total damages" which would be recoverable, "but which are uncompensated because the damages exceed those limits." Secura did not define "underinsured motor vehicle" as one whose applicable liability coverage was also less than the limits of the insured's underinsured motorists coverage.

Secura contends that the interpretation of its policy should follow the type of underinsured motorists coverage required under Ind.Code §§ 27–7–5–4(b), 5(c). However, as Tate correctly points out, these statutes did not exist in 1986 when this policy was issued. Indiana did not then require Secura to provide underinsured motorists coverage, nor did it impose statutory limits upon the nature and operation of such coverage.

Also arguing that "amounts payable" must necessarily mean Tate's coverage limits of $50,000, Secura claims that to hold

otherwise would be to "totally eliminate the reducing clause, thus rewriting the contract of insurance." Brief of Defendant–Appellee at 20. We disagree. Such clause operates to assure that Secura will not have to pay to its insured amounts already received from the tortfeasor, which would be its obligation under the language used in Secura's Coverage C–2 insuring agreement.

Secura urges that its position is supported by *Meridian Mutual Ins. Co. v. Richie* (1988), Ind.App., 517 N.E.2d 1265, *vacated* (1989), Ind., 540 N.E.2d 27, *reinstated on reh'g* (1989), Ind., 544 N.E.2d 488, which also involved the interpretation of underinsured motorists coverage language in an insurance contract. In *Richie* the term "underinsured automobile" was contractually defined to apply only when its limits of bodily injury liability coverage were less than "the applicable limit of liability under this insurance." 517 N.E.2d 1265. This phrase was found to refer to the liability limits of the underinsured motorists coverage itself, rather than the insurance policy's bodily injury liability coverage limits. The decision in *Richie* is not applicable to the present facts because the Meridian Mutual policy language is altogether different from that used in the Secura policy, which defines "underinsured automobile" to apply whenever the tortfeasor's bodily injury liability limits are "less than the amount of total damages an insured person is legally entitled to recover but which are uncompensated because the damages exceed those limits."

We therefore conclude that Tate's underinsured motorist coverage limits do not bar his claim. We agree with the analysis of Judge Shields in her dissent, and we find that the contract provides Tate with underinsured motorists coverage for his bodily injury damages, to the extent these damages exceed the tortfeasor's liability coverage, up to the limits of Tate's own underinsured motorists coverage. Secura is not entitled to summary judgment on this issue.

*2. Exhaustion of Applicable Bodily Injury Liability Insurance*

Secura contends that because Tate failed to assert claims against liability insurance coverages applicable to the disabled vehicle involved in the accident and to the man who had pushed the stalled car to the curb, Tate failed to satisfy policy language stating that payment under Coverage C–2 would occur "only after the limits of liability under *any applicable* bodily injury liability bonds or policies have been exhausted by payment or judgments or settlements" (emphasis added).

■ Ignoring its own policy's definition of the phrase "underinsured motor vehicle," Secura argues that the exhaustion provision should be interpreted in conjunction with the present statutory definition of "underinsured motor vehicle" found in Ind. Code § 27–7–5–4(b) (Ind. P.L. 391–1987(ss), eff. Jan. 1, 1988).

> For the purpose of this chapter, the term "underinsured motor vehicle", *subject to the terms and conditions of such coverage,* includes an insured motor vehicle where the limits of coverage available for payment to the insured under all bodily injury liability policies covering persons liable to the insured are less than the limits for the insured's underinsured motorist coverage at the time of the accident,.... [Emphasis added.]

Such contention is rather disingenuous for several reasons. The statutory definition was first enacted after Secura issued its policy to Tate and even after the date of the accident. It was contained in legislation that established minimum, but not maximum, policy requirements. Furthermore, (although omitted from its partial quotation in Secura's brief) the statutory definition is expressly subject to the actual terms of the policy. Under Secura's own policy the phrase "underinsured motor vehicle" is defined in terms wholly unrelated to the concept "all bodily injury liability policies covering persons liable to the insured" utilized in the statutory definition.

■ The phrase "any applicable" in the exhaustion provision is at best ambiguous. Secura interprets it to refer to *all* potential

policies that it may allege. We disagree. The rules of construction discussed in Issue 1 above require that we find it to mean *any one* policy providing bodily injury liability coverage for a tortfeasor from whom the policyholder may be legally entitled to recover. Under the wording of its policy, Secura is not entitled to summary judgment by reason of Tate's failure to assert claims against others.

### 3. Failure to Obtain Secura's Settlement Consent

Secura contends that Tate is estopped from recovery because he did not obtain Secura's consent to his settlement with the tortfeasor. Secura argues that Tate's settlement operated to destroy its subrogation rights against the tortfeasor, thereby breaching the policy contract, which includes the following pertinent provisions:

B. Exclusions [included as an additional provision applicable only to the uninsured and underinsured coverages]

We do not cover *bodily injury* to a person:

\* \* \* \* \* \*

2. If that person or the legal representative of that person makes settlement without our written consent.

\* \* \* \* \* \*

F. Our Recovery Rights [included in Part IV—General Provisions]

If we make a payment under this policy, we are entitled to all the rights of recovery that the person or organization to or for whom payment was made has against another. That person or organization must:

1. Sign and deliver to us any legal papers relating to that recovery.

2. Do whatever else is necessary to help us exercise those rights and

3. Do nothing after the accident, occurrence or *loss* to harm our rights.

If a person to or for whom we have made payment under this policy also recovers from another, that person shall:

1. Hold the amount recovered in trust for us and

2. Reimburse us to the extent of our payment.

Record at 11, 17. In exchange for payment of the tortfeasor's liability coverage limits of $50,000, Tate executed a covenant not to sue promising to forever refrain from bringing suit against the tortfeasor on account of any and all claims resulting from the accident. Record at 386.

The applicable principles supporting Secura's contention are succinctly stated in *Allstate Ins. Co. v. Meek* (1986), Ind.App., 489 N.E.2d 530, 533:

In summary, an insured who destroys the insurer's contractual subrogation rights breaches the insurance contract and, as a result, extinguishes his right of action on the policy. An insured destroys the insurer's contractual subrogation right by releasing the tortfeasor prior to settling with the insurer because it is that very settlement which enables the insurer to protect its subrogation right by giving notice thereof to the tortfeasor.

However, where the insurer has given notice to the tortfeasor of its payment and the tortfeasor thereafter makes settlement and obtains a release, it will not be a defense as against the insurer in enforcing its rights as subrogee. *Allstate*, 489 N.E.2d at 533, n. 2; *Hockelberg v. Farm Bureau Ins.* (1980), Ind.App., 407 N.E.2d 1160; *American Auto. Fire Ins. Co. v. Spieker* (1933), 97 Ind.App. 533, 187 N.E. 355. Similarly, the rule does not apply where the doctrines of waiver and estoppel are available. *Allstate*, 489 N.E.2d at 533, n. 3; *Farm Bureau Mut. Ins. Co. v. Dercach* (1983), Ind.App., 450 N.E.2d 537; *Nat'l Mut. Ins. Co. v. Fincher* (1981), Ind.App., 428 N.E.2d 1386; *Protective Ins. Co. v. Coca–Cola Bottling Co.* (1981), Ind.App., 423 N.E.2d 656; *West v. Indiana Ins. Co.* (1970), 148 Ind.App. 176, 264 N.E.2d 335.

Tate argues that Secura has waived any subrogation rights and is estopped from asserting any claimed violation thereof because Secura was fully apprised of Tate's claim negotiations and proposed settlement, and yet never objected or raised any issue of intended subrogation. Secura

does not specifically address this argument.

Beginning within a few days after the December 20, 1986, accident, numerous communications occurred between Tate's counsel and Secura's adjuster. By January 17, 1987, Secura knew of Tate's intention to present an underinsured motorists coverage claim. By a letter to the adjuster dated March 30, 1987, Tate's attorney again indicated that such a claim would be made as soon as Tate's medical condition stabilized, and enclosed a copy of a letter to the tortfeasor's insurer offering to settle Tate's claims for payment of the applicable $50,000 liability limits. On April 13, 1987, Tate's counsel informed Secura's adjuster that a settlement had been concluded on April 9, 1987, for the tortfeasor's policy limits, and expressing the intent to make a "formal demand" for settlement pursuant to the underinsured motorist coverage as soon as further information was known regarding Tate's medical progress. At no time did Secura object to Tate's negotiations with the tortfeasor's insurer nor assert any right to consent to any resulting settlement. Tate executed the covenant not to sue on April 21, 1987. In a letter dated April 27, 1987, Secura denied Tate's underinsured motorists coverage claim asserting as the sole grounds provision D–1 (Reductions in the Amounts Payable) because Tate's underinsured motorists coverage limits were the same as the tortfeasor's bodily injury liability limits. As discussed in Issue 1 above, the language of Secura's underinsured motorists coverage does not permit it to deny the claim for this reason.

The term "estoppel" has a meaning distinct from "waiver," but is often used synonymously with "implied waiver."

Technically, there is a distinction between "waiver" and "estoppel." A waiver is an intentional relinquishment of a known right and is a voluntary act, while the elements of estoppel are the misleading of a party entitled to rely on the acts or statements in question and a consequent change of position to his detriment. But in the law of insurance, the distinction between "estoppel" and "implied waiver" is not easy to preserve, and, quite commonly, in insurance cases, the courts have found it unnecessary or inadvisable to make a distinction between them and have used the terms interchangeably.

*Travelers Ins. Co. v. Eviston, Adm'r* (1941), 110 Ind.App. 143, 154, 37 N.E.2d 310, 314. We find nothing in the alleged facts to indicate that Secura expressly manifested an intentional relinquishment of its subrogation rights. Mere silence or inaction on the part of an insurer is not sufficient to constitute an express waiver. *Protective Ins. Co. v. Coca–Cola Bottling Co.* (1981), Ind.App., 423 N.E.2d 656. At issue is whether estoppel or implied waiver may apply. In the absence of resulting prejudice, there is no estoppel or implied waiver. *Id.*

For this reason, we find no estoppel or implied waiver from Secura's conduct in failing to include in its April 27, 1987, denial letter any assertion or reservation of its contractual rights to consent to settlement and to subrogation. By this time, Tate had already negotiated his settlement with the tortfeasor and signed the covenant not to sue. Tate suffered no prejudice from Secura's letter of April 27.

The remaining related question is whether an estoppel may arise from Secura's failure to act between January 17, 1987, and April 9, 1987, notwithstanding its knowledge of Tate's negotiations seeking settlement for the tortfeasor's liability coverage limits. The facts in this case are similar to those in *Fincher*, 428 N.E.2d 1386, which involved a claim for uninsured motorists coverage denied on grounds that the insured had already covenanted not to sue the tortfeasor and had thereby destroyed the insurer's subrogation rights.

Acknowledging the general rule that recovery by an insured is barred when, before receiving payment from his own insurer, the insured settles with or releases the alleged tortfeasor, *Fincher* nevertheless applied [implied] waiver and estoppel, finding that under the evidence the trial court

properly found that the insurer had waived, or was estopped to assert, its right of subrogation.

> [A]n insurer "cannot sit down and hold its hands and purse and thereafter escape liability for fulfillment of its contract by reason of the insured's effort, after fair notice, to recoup his loss by litigation against a wrongdoer."

428 N.E.2d at 1390 (quoting with approval from *Powers v. Calvert Fire Ins. Co.* (1950), 216 S.C. 309, 316, 57 S.E.2d 638, 642).

We conclude that genuine issues of fact exist relating to whether Secura's silence notwithstanding knowledge of Tate's ongoing negotiations operated to mislead Tate, whether Tate was entitled to rely on Secura's said conduct, and whether Tate suffered a consequent change of position to his detriment. Secura is not entitled to summary judgment on this issue.

### Conclusion

The opinion of the Court of Appeals is vacated, the order of summary judgment is reversed, and this cause is remanded to the trial court for further proceedings.

SHEPARD, C.J., and DeBRULER, GIVAN and KRAHULIK, JJ., concur.