**William E. DANIELS, Plaintiff,**

v.

**The CINCINNATI INSURANCE COMPANY, Defendant.**

**No. IP91–191–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 4, 1992.

---

Kent M. Frandsen, Parr, Richey, Obremskey & Morton, Lebanon, Ind., for plaintiff.

Martha S. Hollingsworth, Tammy J. Meyer, Bingham Summers Welsh & Spilman, Indianapolis, Ind., for defendant.

BARKER, District Judge.

## I. BACKGROUND

William E. Daniels, at all times relevant, was the president, sole shareholder, and Chief Executive Officer of Wedzeb Enterprises, Inc., an electrical supply company. Wedzeb had a warehouse in Lebanon,

Indiana, and in that warehouse it stored electrical capacitors, transformers, and other electrical equipment, most of which contained polychlorinated biphenyls. The land on which the warehouse sat was owned by Daniels and leased to Wedzeb. On May 2, 1981, the Wedzeb warehouse burned down, and polychlorinated biphenyls, "hazardous substances," *see* Section 101(14) of the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. § 9601(14), escaped into the environment.

On October 2, 1985, the Environmental Protection Agency (hereinafter referred to as the EPA) issued an administrative order instructing Daniels and Wedzeb to conduct contamination studies and contain and clean up the contaminated rubble and soil. Approximately five years later, the United States, on behalf of the EPA, filed suit against Daniels, Wedzeb, and others, seeking enforcement of the October 2, 1985 administrative order and reimbursement for costs the EPA incurred by responding to and cleaning up the damage from the May 2, 1981 Wedzeb fire.

At the time of the fire, Wedzeb was insured by the defendant, the Cincinnati Insurance Company (hereinafter referred to as Cincinnati), who had issued Wedzeb a comprehensive catastrophe policy, entitled the Comprehensive Commercial Catastrophe Liability Policy No. CCC 284 17 81 (hereinafter referred to as the Comprehensive Policy). Daniels was personally insured by Cincinnati under an umbrella policy attached to the Comprehensive Policy, entitled the Comprehensive Personal Catastrophe Liability Enforcement policy (hereinafter referred to as the Umbrella Policy). When Cincinnati took the position that Daniels was not personally covered under the Umbrella Policy for damages arising from the May 2, 1981 Wedzeb fire and the subsequent contamination, specifically, the EPA's claim for reimbursement of the response and clean up costs, Daniels filed an action in state court seeking a declaration of his rights under the insurance policy. That action was removed to this Court under 28 U.S.C. § 1446(b).

Cincinnati claims that the Umbrella Policy does not afford Daniels coverage for the claims the United States makes against him personally, and it has filed a Counterclaim for Declaratory Judgment and a motion for summary judgment, asserting that Exclusion (h) of the Umbrella Policy precludes coverage for any of Daniels' business and business property.

Section II of the Umbrella Policy provides (in relevant part):

This endorsement shall not apply:

\* \* \* \* \* \*

(h) to any BUSINESS or BUSINESS PROPERTY (other than farms) of an INSURED except to the extent that insurance therefore is provided by an underlying policy listed in Schedule A hereof; provided, this exclusion shall not apply to the use of private passenger automobiles for business purposes other than as a public or livery conveyance; ...

Section III of the Umbrella Policy states (in relevant part):

6. "BUSINESS" includes trade, profession or occupation.
7. "BUSINESS PROPERTY" includes (a) property on which a business is conducted and (b) property rented in whole or in part for others, or held for such rental.

In response to the motion for summary judgment, Daniels alleges that he "purchased the [Umbrella Policy] to obtain umbrella protection and coverage for claims which might be asserted personally against him," and that it was his "desire and expectation that the [Umbrella Policy would provide him] with personal indemnity coverage for bodily injury or property damage claims which might arise out of ... [his] business activities." Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, Daniels Affidavit, ¶¶ 3 and 4. Further, citing *Grinnell Mutual Reinsurance Co. v. Wasmuth,* 432 N.W.2d 495, 499 (Minn.App.1988), Daniels claims that under "the reasonable expectations doctrine," his expectations should be given effect under the Umbrella Policy, even if a careful ex-

amination of the policy would rebut that expectation.

Daniels also claims that the Umbrella Policy is ambiguous, asserting that (1) the policy application requires an applicant to list his or her occupation, yet does not highlight or emphasize that business or business property claims are not covered under the policy, (2) the exclusionary language used in the policy does not clearly and conspicuously notify the insured that the policy does not cover business or business property (because the exclusion is in small print and listed eighth among ten other exclusions), and (3) the policy contains at least three qualifiers,[1] which make the policy confusing to read and difficult to understand.

## II. DISCUSSION

■ In Indiana, the interpretation of an insurance policy, as with other contracts,[2] is primarily a question of law, even if the policy contains an ambiguity needing resolution. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind.1992). Although the Indiana Supreme Court has instructed, "Courts should strive to give effect to the reasonable expectation of the insured," *Meridian Mut. Ins. Co. v. Richie*, 540 N.E.2d 27, 30 (Ind.1989), it has recently held that "it is only where a contract is ambiguous and its interpretation requires extrinsic evidence that the fact finder much determine the facts upon which the contract rests." *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992).

■ When an insurance policy is clear and unambiguous, it should be given its plain and ordinary meaning. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind.1992). On the other hand, if a policy is "ambiguous or of doubtful meaning," it should be interpreted "most favorable to the insured" and construed to "further the policy's basic

purpose of indemnity." *Id.* An insurance policy is ambiguous and of doubtful meaning if reasonable people may honestly differ as to the meaning of the policy language. *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985); *see United American Ins. Co. v. Wibracht*, 825 F.2d 1196, 1202 (7th Cir.1987) (quoting *Kremers–Urban Co. v. American Employers Ins. Co.*, 119 Wis.2d 722, 351 N.W.2d 156, 163 (1984), the Seventh Circuit stated that the "words of an insurance contract are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean but what a reasonable person in the position of the insured would have understood the words to mean"). "[O]ur job is to interpret the umbrella policy as the language in it is used, not to search for some hidden meaning in that language based on unsupported assertions about what those words might mean in some other context." *State Farm Fire and Casualty Insurance Co. v. First National Bank*, 969 F.2d 521, 523 (7th Cir.1992).

### Exclusion (h): Losses to "Business" and "Business Property"

■ The Umbrella Policy, with regard to whether it covers injuries to Daniels' business or business property, is not ambiguous; in clear, partially capitalized, and defined terms, the policy states that it "shall not apply ... to any BUSINESS or BUSINESS PROPERTY, where the insured's "business" is his trade, profession or occupation, and his "business property" is property on which "business" is conducted. Reasonable people could not differ on this aspect of the Umbrella Policy; even the title of the Umbrella Policy implies that the policy's purpose is to insure against "personal" liability. *See State Farm Fire and Casualty Insurance Company v. First National Bank*, 969 F.2d 521, 525 (7th

---

**1.** Daniels claims that under the Umbrella Policy, (1) businesses are excluded but farms are not, (2) business and business property are excluded from the policy "except to the extent that insurance therefore is provided by an underlying policy listed in Schedule A hereof," and (3) Exclusion (h) does not apply when private pas-

senger automobiles are used for a business purpose.

**2.** Under Indiana law, "contracts for insurance are subject to the same rules of interpretation as are other contracts." *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985).

Cir.1992); *compare Property Owners Ins. Co. v. Cope,* 772 F.Supp. 1096, 1101 (N.D.Ind.1991) (court concluded the clause "with respect to conduct of business" was not self-defining and ambiguous as applied to the situation where the insured sought coverage for activities that had a dual purpose of recreation and profit).

Exclusion (h) of the Umbrella Policy is not made ambiguous by the exceptions or because the policy application has a place for the applicant to list his or her occupation. And the claim that the policy is ambiguous because the exclusions are in "small type" is at best misleading; the entire policy is written in that same small-sized font. This case does not present the situation "where a contract is ambiguous and its interpretation requires extrinsic evidence that the fact finder must determine the facts upon which the contract rests," and the Court therefore will not consider Daniels' proffer of extrinsic evidence, that is, his personal expectations concerning scope of coverage of the Umbrella Policy. *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992).

### EPA's Response Costs: Daniels' "Business" or "Business Property"?

█ Although the Court concludes that the Umbrella Policy clearly does not provide coverage for losses of an insured's "BUSINESS" or "BUSINESS PROPERTY," it is not also the case that the policy necessarily excludes coverage for a loss *caused* by a business or business property. *Compare State Farm v. First National Bank, supra,* at 522. Rather, the clear purpose of the Umbrella Policy is to insure Daniels for the ultimate net loss which he "shall become legally obligated to pay as damages because of a PERSONAL INJURY or PROPERTY DAMAGE, caused by an occurrence, anywhere during the endorsement period," i.e., when a third party suffers property damage and somehow attributes that loss to the insured.

Daniels does not seek a declaratory judgment on the issue of whether Cincinnati must reimburse him (personally) for his business losses, i.e., the loss of the Wedzeb warehouse, the destroyed electrical equipment, or the decreased value of his land. If he did, his complaint would warrant dismissal for, as discussed above, such a claim is expressly excluded under Exclusion (h) of the Umbrella Policy. Instead, Daniels seeks a declaratory judgment on the issue of whether he is entitled to coverage if the United States prevails in its suit against Daniels to recover the damages the EPA suffered when it responded to and bore the expense of cleaning up Wedzeb's environmental damage.

When pollutants are released into the soil, water, and air within a state or federal government's jurisdiction, those sovereigns are deemed to have suffered an injury to their "quasi-sovereign" interests. Thus, "the improper release of toxic wastes may cause 'property damage' not only to the actual owner of the land ... but also to state and federal governments because of their 'interest independent of and behind the titles of its citizens in all the earth and air within [their] domain.'" *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chemical Co.,* 811 F.2d 1180, 1185, 1187 (8th Cir.1987), *affirmed in part, reversed in part,* 842 F.2d 977, 983 (8th Cir.) *(en banc)* (reversed panel decision on grounds that an "as damages" clause does not include claims for equitable relief, but agreed with the panel on the point that "environmental contamination caused by improper disposal of hazardous wastes can constitute 'property damage.'"), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). Reimbursement for the EPA's efforts to lessen the injury to the environment is what the United States seeks to recover from Daniels, and, as such, that injury is exactly what the Umbrella Policy is supposed to insure against, damages that result from an injury to a third person that can somehow be attributed to Daniels personally.

█ It is important to note that the United States does not seek damages for the actual harm to the environment, as it could under 42 U.S.C. § 9607(a)(4)(C). Rather, it

asks "only"[3] for reimbursement for the EPA's response and clean up costs. The terms of an insurance contract are to be construed as to their plain meaning, that is, what an honest and reasonable lay person would interpret the terms' meaning to be. Although some of the circuit and state courts have split on whether response costs can be recovered as "damages" under an insurance policy (on the basis that "recovery claims under CERCLA do not seek damage relief, but are restitutional in nature," *Verlan, Ltd. v. John L. Armitage & Co.*, 695 F.Supp. 950, 954 (N.D.Ill.1988)), this Court finds that the approach taken by the Second, Third, Ninth, and the District of Columbia Circuits (the Seventh Circuit has not spoken on this issue) is the better-reasoned approach: that a suit to recover response costs incurred by the EPA constitutes "damages" within the context of a standard umbrella insurance policy. *Aetna Casualty and Surety Co. v. Pintlar Corp.*, 948 F.2d 1507, 1512 and fn. 4 (9th Cir.1991).

Liability for environmental clean up costs quite naturally fits in the common and ordinary meaning of those claims an insured "becomes legally obligated to pay as damages because of personal injury or property damage caused by an occurrence;" the ordinary, reasonable lay-insured does not distinguish between real and equitable relief when construing damages or when acquiring insurance coverage. *Independent Petrochemical Corp. v. Aetna Casualty and Surety Co.*, 944 F.2d 940, 947 (D.C.Cir. 1991) (citing *Continental Ins. v. N.E. Pharm. & Chem Co.*, 842 F.2d at 985).

Dictionary definitions indicate that in the lexicon of the ordinary person, the plain meaning of the term "damages" would include response costs. This is so because the term "damages," in common thought, does not distinguish between equitable and nonequitable relief. "Any definition of 'damages' which is grounded upon the ancient division between law and equity—such as the definition now proffered by the insurers—would hardly

be an 'ordinary and accepted meaning' in the eyes of a 'reasonably prudent layperson.'" ...

A technical, arcane approach in discerning the meaning of damages under the policies must not be taken. The plain meaning of "damages" from the perspective of an ordinary person would include CERCLA response costs.

*Aetna Casualty and Surety Co. v. Pintlar Corp.*, 948 F.2d at 1513 (citing *Chesapeake Utilities Corp. v. American Home Assurance Co.*, 704 F.Supp. 551, 560 (D.Del. 1989)). This Court agrees, and therefore holds, that an ordinary and reasonable reading of the provisions of the umbrella policy at issue here is that "damages" includes claims for EPA response and clean up costs. Cincinnati's motion for summary judgment on the issue that Exclusion (h) precludes coverage for the EPA's response and clean up costs is therefore without merit and must be denied.

## III. CONCLUSION

In accord with the above discussion, the Court concludes that Cincinnati is legally obligated under the Umbrella Policy to cover Daniels in the event that he personally has to reimburse the United States for the EPA's response and clean up costs. Cincinnati's motion for summary judgment is DENIED, and JUDGMENT shall ENTER in favor of the plaintiff.

It is so ORDERED.

---

**3.** The United States seeks "at least" $1,328,100, plus $25,000 for each day the plaintiffs violate

the October 2, 1985 administrative order.