In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3613

TRINITY HOMES LLC and
BEAZER HOMES INVESTMENTS, LLC,

*Plaintiffs-Appellants,*

*v.*

OHIO CASUALTY INSURANCE COMPANY and
CINCINNATI INSURANCE COMPANY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:04-cv-1920—**Sarah Evans Barker**, *Judge.*

ARGUED MARCH 29, 2010—DECIDED DECEMBER 22, 2010

Before CUDAHY and KANNE, *Circuit Judges*, and
DARRAH, *District Judge.*[*]

---

[*] The Honorable John W. Darrah, United States District
Judge for the Northern District of Illinois, sitting by designation.

KANNE, *Circuit Judge.*   Plaintiffs Trinity Homes and Beazer Homes Investments (collectively referred to as Beazer) were general contractors tasked with the construction of multiple residences throughout Indiana. Rather than build the homes itself, Beazer employed a bevy of subcontractors to handle the home construction—construction that turned out to be defective. After Beazer incurred significant liability related to the defective work and its insurers failed to provide coverage, it brought a claim against both its primary insurers and its umbrella insurer in district court alleging breach of contract and seeking a declaration that all of the insurers had a duty to provide coverage.

While most of the primary insurers settled with Beazer, Ohio Casualty Insurance Company stood resolute, claiming its policy did not cover faulty subcontractor work. The umbrella policy holder, Cincinnati Insurance Company, also argued that its coverage was not triggered because all of Beazer's underlying policies were not unavailable, as required by the umbrella policy.

The district court granted summary judgment in favor of the insurers. We disagree with the district court's construction of both insurance policies and reverse the grant of summary judgment in favor of the insurers and remand for further proceedings.

## I. BACKGROUND

Beazer was in the business of new home construction. To that end, it entered into thousands of contracts with

purchasers who wanted the classic American dream: a home to call their own. Each contract provided that Beazer would serve as general contractor and warranted that the homes would be free of defects caused by shoddy workmanship. Rather than build the homes itself, Beazer used a number of subcontractors to take care of the actual home construction.

To many homeowners' disappointment, their dream homes turned out to be lemons. Due to faulty work by Beazer's subcontractors, a number of the homes were plagued with structural problems. These defects allowed water to enter the homes, which in turn resulted in physical damage to the residences and health problems for the occupants. Beginning in 2002, the homeowners sued Beazer in Indiana state court for the costs associated with remedying the subcontractors' deficient work. In all, Beazer faced thirteen lawsuits, including multiple class actions.

Confronted with significant liability, Beazer sought coverage for the liability associated with the underlying lawsuits. Beazer had multiple primary commercial general liability (CGL) policies, which covered Beazer's liability resulting from "property damage" caused by an "occurrence," as those terms were defined in the policies. Beazer also had an umbrella policy with Cincinnati Insurance Company that covered liability in excess of or not covered by its CGL policies. None of the insurers recognized a duty to defend or indemnify Beazer.

To compel coverage, Beazer brought a diversity suit in the United States District Court for the Southern

District of Indiana against the insurers. Beazer claimed that the insurers breached the insurance contracts when they denied coverage, and it also sought a declaration that the insurance companies must provide coverage for the liability incurred. During the pendency of Beazer's suit, nearly all of the CGL insurers settled. Each of those insurers settled for at least seventy-five percent of the relevant policy limit, and each settlement agreement provided that Beazer would be responsible for the remainder of the limit, functionally exhausting the CGL policy. But one of the front-line providers, Ohio Casualty Insurance Company, held its ground, claiming that damage to a home arising from faulty subcontractor work was not "property damage" caused by an "occurrence" within the meaning of the policy. The umbrella insurer, Cincinnati Insurance Company, also argued that its policy was not triggered, as a number of the CGL policies were neither completely exhausted nor otherwise unavailable.

The parties filed cross motions for summary judgment. The district court granted summary judgment in favor of Ohio Casualty on the grounds that the policy language did not cover the underlying home damage, and in favor of Cincinnati because some of Beazer's CGL policies were still available. Beazer timely appealed the grants of summary judgment in favor of both insurers.

## II. ANALYSIS

We review a district court's grant of summary judgment, along with its construction of an insurance policy,

*de novo. ACE Am. Ins. Co. v. RC2 Corp.*, 600 F.3d 763, 766 (7th Cir. 2010). We view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Abstract & Title Guar. Co. v. Chicago Ins. Co.*, 489 F.3d 808, 810 (7th Cir. 2007).

As the parties correctly agree, our inquiry is governed by Indiana law. As such, we must apply Indiana law as we predict the Indiana Supreme Court would apply it. *Clark v. State Farm Mut. Auto. Ins. Co.*, 473 F.3d 708, 712 (7th Cir. 2007). Under Indiana law, the interpretation of an insurance contract is a question of law. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992). To determine whether an insurance policy provides coverage, we must first determine whether the policy is clear or ambiguous. If the grant of coverage is clear, we assign to it its plain and ordinary meaning and enforce it accordingly. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). If the language is ambiguous, however, we must construe it in favor of the insured. *Tate*, 587 N.E.2d at 668. Keeping these principles in mind, we proceed to evaluate each grant of summary judgment in turn.

### A. The Ohio Casualty CGL Policy

Beazer sought coverage under the Ohio Casualty policy for the liability from one of its thirteen lawsuits. As part of that suit's settlement, Beazer agreed to repair water damage to a number of homes caused by faulty

subcontractor work. Ohio Casualty denied Beazer's claim, stating that the policy does not cover liability stemming from that type of damage.

Ohio Casualty's policy is a standard-form CGL policy. In relevant part, the policy provides that Ohio Casualty will cover "those sums that the insured becomes legally obligated to pay as damages" due to "property damage" caused by an "occurrence." The policy goes on to define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." The policy states that an "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Notably, the policy does not define the word "accident."

In granting summary judgment in favor of Ohio Casualty, the district court held that the faulty subcontractor work was not "property damage" caused by an "occurrence." The district court first held that the term "property damage" did not include damage done to the home itself. Relying on Indiana state court decisions, including *Sheehan Constr. Co. v. Cont'l Cas. Co.*, 908 N.E.2d 305 (Ind. Ct. App. 2009), the court drew a distinction between two types of damage caused by a subcontractor's work: damage to property distinct from the home, which would typically be covered by a standard CGL policy, and damage to the home's structure itself, which would not be covered. The district court went on to hold that, even if there was "property

damage," it was not caused by an "occurrence." To be an "occurrence" under the policy, the event must be an "accident." Again citing to Indiana case law, the district court ruled that the ordinary consequences of faulty workmanship did not constitute an "accident" within the policy's coverage.

After the district court granted summary judgment for Ohio Casualty, the Indiana Supreme Court authoritatively weighed in on the *Sheehan* case. *Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160 (Ind. 2010). Similar to the case at bar, *Sheehan* involved a homebuilder who was sued for damages caused by faulty subcontractor work and sought coverage under his CGL policy— a policy identical in all relevant respects to Ohio Casualty's. The Indiana Supreme Court vacated the opinion of the Indiana Court of Appeals and clarified that a standard CGL policy does cover damage to a home's structure resulting from shoddy subcontractor work unless the subcontractor work was intentionally faulty. *Id.* at 170.

Because the precedential landscape has changed, the district court's grant of summary judgment in favor of Ohio Casualty must be reversed, and the case remanded for reconsideration in light of *Sheehan*. We leave the application of any exclusions or limitations in the policy, as well as any other state law doctrines, for the district court on remand.

B. *The Cincinnati Insurance Umbrella Policy*

Beazer also sought coverage from Cincinnati Insurance, its umbrella insurer, for the liability that exceeded the limits of its CGL policies. Beazer claimed that its umbrella coverage was triggered because no remaining CGL coverage was available; some of its CGL insurers denied coverage, while others entered into settlement agreements that functionally exhausted the CGL policies. Cincinnati declined to cover Beazer's claim.

The insuring agreement of Cincinnati's umbrella policy provides:

> We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages in excess of the "underlying insurance" or for an "occurrence" covered by this policy which is either excluded or not covered by "underlying insurance" because of:
>
> 1. "Bodily injury" or "property damage" covered by this policy occurring during the policy period and caused by an "occurrence"; or
>
> 2. "Personal injury" or "advertising injury" covered by this policy committed during the policy period and caused by an "occurrence."

The policy defines "underlying insurance" as "the policies of the insurance listed in the Schedule of Underlying Policies and the insurance available to the insured under all other insurance policies applicable to the 'occurrence.'" "Occurrence" is defined, in relevant part, as "an accident, including continuous or repeated exposure to substantially the same general

harmful conditions, that results in 'bodily injury' or 'property damage.'"

The policy also includes a Limits of Insurance clause, which states:

a. If the limits of "underlying insurance" have been reduced by payment of claims, this policy will continue in force as excess of the reduced "underlying insurance"; or

b. If the limits of "underlying insurance" have been exhausted by payment of claims, this policy will continue in force as "underlying insurance."

Reading the limits of insurance together with the grant of coverage, the district court held that all relevant CGL policies must be unavailable—via exhaustion or a denial of coverage—before Cincinnati's policy is triggered. The district court held that the settling insurers' CGL policies were not exhausted, as the full limits were not paid out by the actual CGL insurers. For two of the remaining CGL insurers, the district court held that Beazer did not offer sufficient evidence to show that the policies were unavailable. As such, the district court held that Cincinnati's duties were not triggered.

We first address the district court's holding that all of Beazer's CGL policies must be unavailable before the umbrella policy is triggered. While the district court's statement is correct, some fleshing out is in order. The umbrella policy does provide that "underlying insurance" includes "all other insurance policies" held by Beazer, in addition to the single CGL policy listed in the

Schedule of Underlying Policies. However, the contract also states that other "underlying insurance" includes only those policies "applicable" to an "occurrence." As such, only those additional CGL policies linked to Beazer's liability qualify as "underlying insurance" under the umbrella policy terms.

We turn next to whether a settlement between Beazer and its CGL insurers, where the insurer paid at least seventy-five percent of the policy limit and Beazer made up the difference, was sufficient to exhaust the CGL's policy coverage under the umbrella policy. The district court held that the language of the umbrella policy was clear and that only a full payout by the actual CGL insurer could exhaust the relevant CGL policy.

Here, we disagree with the district court's conclusion that the umbrella policy clearly required exhaustion of the CGL limit by insurer payout alone. The umbrella policy is clear only insofar as it requires that the underlying CGL coverage be unavailable—either by exhaustion or denial of coverage—before Cincinnati's coverage is triggered. While the umbrella agreement does state that a CGL policy is exhausted when the policy limit has been completely expended, it does not clearly provide that the full limit must be paid out by the CGL insurer alone. As such, the policy is ambiguous and susceptible to the meaning put forth by Beazer—that a CGL policy can be exhausted when an insured and a CGL insurer enter into a settlement agreement where the primary insurer will pay a large percentage of the total limit and the insured takes responsibility for the

remainder. So long as an insurance term or condition is ambiguous, Indiana law requires that we construe it in favor of the insured—here, Beazer. *See Tate*, 587 N.E.2d at 668.

To counter this ambiguity, Cincinnati notes that other courts dealing with similar umbrella policies have held that the policies required a full payout by the CGL insurer before the CGL policy was exhausted. These cases, however, are not apposite to the contract here: in each, the policy clearly stated that the coverage was not triggered absent a payment of the full CGL policy limit by the insurer. *Comerica Inc. v . Zurich Am. Ins. Co.*, 498 F. Supp. 2d 1019, 1022 (E.D. Mich. 2007) (policy required payment by the "applicable insurers" before coverage was triggered); *Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London*, 73 Cal. Rptr. 3d 770, 778 (Cal. Ct. App. 2008) (CGL policy exhausted only after "the insurers under each of the Underlying policies have paid or have been held liable to pay the full amount of the Underlying Limit"). Cincinnati could have used similarly clear language in its policy, but it did not, and it must now bear the burden of its ambiguity.

While the parties have not put forth any Indiana precedent directly on point, our sister circuits have dealt with similar umbrella policies, and their holdings lend further support to this interpretation of Cincinnati's policy. In *Zeig*, the Second Circuit held that exhaustion of a primary policy limit could be accomplished by way of a settlement agreement where the primary insurer paid some of the limit and the insured paid the

remainder, so long as the contract did not provide otherwise. *Zeig v. Mass. Bonding & Ins. Co.*, 23 F.2d 665, 666 (2d Cir. 1928). The Third Circuit ruled similarly in *Koppers*, holding that "settlement with the primary insurer functionally 'exhausts' primary coverage and therefore triggers the excess policy—though by settling the policyholder loses any right to coverage of the difference between the settlement amount and the primary policy's limits." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1454 (3d Cir. 1996). Although Indiana law controls, there is no reason to suspect that it would differ from these analogous holdings.

Our construction of the ambiguity in Cincinnati's policy is also reinforced by Indiana public policy favoring out-of-court settlement. *See Midwest Mut. Ins. Co. v. Ind. Ins. Co.*, 412 N.E.2d 84, 89 (Ind. Ct. App. 1980). Cincinnati's reading of the policy would deter parties who have both CGL and excess insurance from settling with their CGL insurers. Rather than agree to a lower payout by a CGL provider as part of a settlement, an insured with an excess policy would be forced to fully litigate each and every one of its CGL policy claims before seeking recourse from its umbrella insurer. Unless the clear language of the contract counsels otherwise, Indiana public policy favors an interpretation that encourages—not discourages—settlement.

Moreover, this construction of the policy neither has a punitive effect on Cincinnati nor does it alter its underwriting considerations. Beazer is not asking Cincinnati to drop down and pay the remainder of the CGL limits

after its settlement with the CGL insurers. As required by the CGL settlements, Beazer paid the remainder of the CGL limits itself. Beazer only asks Cincinnati to cover the liability Beazer is "legally obligated to pay as damages in excess of the 'underlying insurance,'" as stated in the umbrella policy.

We finally address whether Beazer put forth sufficient evidence to show that all of the applicable CGL policies were unavailable—by means of settlement or denial of coverage. The district court held that Beazer failed to show that two of the CGL policies, the FCCI policy and the American Employers Policy, were unavailable. We disagree. To show that both policies were unavailable, Beazer offered a declaration from its Vice President of Risk Management, W. Mark Berry. In his declaration, Berry referred to the policies by name, discussed the applicable period of coverage, and explained the circumstances leading up to the denial of coverage for one policy and the settlement for another. This declaration, while self-serving, was not conclusory: it was based on Berry's personal knowledge and provided sufficient detail to show that the two policies were unavailable. Contrary to the district court's holding, we believe this evidence at least establishes a genuine issue of material fact. *See Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("It is worth pointing out here that we long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.' If based on personal knowledge or

firsthand experience, such testimony can be evidence of disputed material facts.").

Because the district court's interpretation of the contract was erroneous, we must reverse the grant of summary judgment in favor of Cincinnati. Since the matter was neither addressed by the district court nor thoroughly briefed by the parties, we decline to reach the question of whether any exclusions or limitations in Cincinnati's policy apply to Beazer's claim, leaving that for further proceedings on remand.

## III. CONCLUSION

Based on the foregoing reasons, we REVERSE the grant of summary judgment in favor of Ohio Casualty, we REVERSE the grant of summary judgment in favor of Cincinnati Insurance, and we REMAND the case to the district court for further proceedings.