In the
# United States Court of Appeals
## For the Seventh Circuit

No. 18-1737

THE MEDICAL PROTECTIVE COMPANY OF FORT WAYNE, INDIANA,

*Plaintiff-Appellant*,

*v.*

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, now known as AIG SPECIALTY INSURANCE COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. No. 1:13-cv-00357-JTM — **James T. Moody**, *Judge*.

ARGUED NOVEMBER 8, 2018 — DECIDED DECEMBER 18, 2018

Before FLAUM, MANION, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. In 2002, thirty-six-year-old Vicki Bramlett died from complications following routine surgery. Mrs. Bramlett's family sued Dr. Benny Phillips, her treating physician. Dr. Phillips's malpractice insurer, the Medical Protective Company of Fort Wayne, Indiana ("MedPro"), twice

refused to settle the case for $200,000, Dr. Phillips's insurance policy limit. At trial, a jury awarded a $14 million verdict against Dr. Phillips and other defendants. The Supreme Court of Texas later capped Dr. Phillips's liability, and Mrs. Bramlett's family sued MedPro for the excess verdict. MedPro eventually settled with the family.

MedPro was insured by American International Specialty Lines Insurance Company, now known as AIG Specialty Insurance Company ("AISLIC"), for claims made against it. AISLIC declined to cover MedPro's settlement with Mrs. Bramlett's family. When MedPro sued, the parties ultimately cross-moved for summary judgment. The district court granted summary judgment for AISLIC, concluding that coverage was excluded under the AISLIC policy because MedPro should have foreseen the Bramlett family's claim before contracting with AISLIC. Because there is a genuine issue of material fact regarding whether MedPro should have settled with the Bramletts for $200,000, we affirm in part and reverse in part.

## I. Background

### A. The Bramlett Lawsuits

In late October 2002, in Lubbock, Texas, Dr. Benny Phillips performed a laparoscopic hysterectomy on Vicki Bramlett, a thirty-six-year-old mother and wife. Following the surgery, while still hospitalized, Mrs. Bramlett suffered internal bleeding. She was rushed into surgery, but she died four days later after being removed from life support.

In May 2003, Mrs. Bramlett's husband and children filed a wrongful death lawsuit against Dr. Phillips, his clinic (Lubbock Gynecologic Oncology Associates), Covenant

Healthcare System (where Mrs. Bramlett had been hospital-ized), and Covenant's nurses. Dr. Phillips held a $200,000 healthcare professional liability insurance policy with MedPro, and he notified MedPro of the lawsuit. In November 2003, the hospital settled with the Bramletts for approxi-mately $2.3 million, leaving only Dr. Phillips and his clinic re-maining in the suit.

On December 17, 2003, the Bramletts wrote to Dr. Phil-lips's attorney, Benjamin H. Davidson, II, making what is known in Texas as a *Stowers* demand. The *Stowers* doctrine comes from *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved), and provides that if a plaintiff makes a demand to an insurer that is within the insured's policy limit and that a reasonably pru-dent insurer would accept, but the insurer rejects the demand, the insurer will later be liable for any amount awarded over the policy limit. *See also Phillips v. Bramlett*, 288 S.W.3d 876, 879 (Tex. 2009). The Bramletts offered to settle the case for Dr. Phillips's policy limit, $200,000. MedPro did not settle with the Bramletts. Discovery was still pending at the time, and MedPro wanted to wait and see what information would be unearthed during discovery.

The record reflects that, as early as January 5, 2004, MedPro knew that Dr. Phillips did not attend to Mrs. Bram-lett's internal bleeding because he had left the hospital to ex-ercise. MedPro's case notes from this time, however, suggest an understanding that Dr. Phillips had not been informed of concerns regarding Mrs. Bramlett's recovery, and that if he had been informed, he would have immediately acted.

On March 23, 2004, the Bramletts made a second *Stowers* demand, again offering to settle for the $200,000 policy limit.

The Bramletts also sent Dr. Phillips's attorney, Mr. Davidson, an expert report from a doctor at the University of Texas. The expert opined that Dr. Phillips had breached the standard of care by failing to timely follow up on Mrs. Bramlett's abnormal hemoglobin and fluid challenge tests results, and that this breach was a proximate cause of Mrs. Bramlett's death.

On April 12, 2004, Mr. Davidson responded to the second *Stowers* demand, rejecting it. Mr. Davidson wrote that he believed settlement was premature given that discovery was not complete, particularly because the parties had not yet deposed Mr. Bramlett and the hospital nurses. Mr. Davidson sent this response three days after the expiration of the *Stowers* settlement offer.

Discovery continued, and in May 2004, Mr. Davidson notified MedPro of defense issues he foresaw in the lawsuit. Notably, it was brought out during discovery that, in the evening following the surgery, Dr. Phillips had received a voicemail notifying him that Mrs. Bramlett's hemoglobin levels had dropped. Despite this voicemail, Dr. Phillips left the hospital to exercise. Had Dr. Phillips gone straight to attend to Mrs. Bramlett rather than going to exercise, she likely would have lived. Even in the face of these facts, Mr. Davidson told MedPro that there was a 60 percent chance that Dr. Phillips's defense would succeed. Mr. Davidson estimated that in the event of an adverse jury verdict, the award for the Bramletts would be approximately $2.5 to $3 million.

Dr. Phillips obtained additional counsel, who held a grimmer outlook on the likelihood of a successful defense. Later in 2004, that attorney, Nevill Manning, wrote to MedPro, stating quite bluntly that he believed "without hesitation … that a jury of twelve people in Lubbock County, Texas, will almost

assuredly conclude that the allegations made against Dr. Phillips and [his clinic] are correct, and, thus, liability may be imposed against them in a substantial proportion." He further noted his concern that MedPro had previously declined the Bramletts' two *Stowers* demands. Mr. Manning demanded that MedPro settle with the Bramletts rather than proceed with what was likely to be a losing trial. Mr. Davidson also began to change his tune. In January 2005, he advised MedPro that the probability of a successful defense was about 20 percent and an adverse jury verdict was likely to be approximately $3 million.

In February 2005, the Bramletts and MedPro attended a mediation. According to MedPro's case notes, the trial judge ordered the mediation because the Bramletts sought punitive damages against Dr. Phillips and were alleging "Stowers issues" as to MedPro. Prior to the mediation, MedPro made settlement offers to the Bramletts of $100,000, then $200,000. The Bramletts rejected both offers and instead demanded $2.3 million to settle the case, which MedPro rejected. After the mediation, a MedPro claims specialist who attended the mediation emailed the assigned claims specialist and his supervisor. He advised that, based on what he had learned at the mediation, an adverse verdict was likely and could be about $3 million. He further noted that MedPro's responses to the Bramletts' two *Stowers* demands had been inadequate and had not given sufficient reasoning for declining to settle the case. The claims specialist recommended that MedPro hire an attorney to protect its interests.

Mr. Manning also wrote to MedPro after the mediation, reiterating his belief in the likelihood of an adverse verdict and again demanding that MedPro negotiate with the

Bramletts and accept their lowest settlement offer. Mr. Manning noted that "the mediator made it very clear … that [Dr. Phillips] was certain of being held liable." The mediator had further expressed that MedPro faced "severe and certain exposure" for a verdict in excess of Dr. Phillips's policy limit, given MedPro's failure to accept the Bramletts' *Stowers* demands.

In April 2005, a litigation attorney at MedPro was notified of the situation and sought advice from outside counsel. Outside counsel advised that MedPro had not acted in bad faith by declining the *Stowers* demands in order to investigate the claims. He stated that, at that time, there was no basis for MedPro to offer to settle with the Bramletts for more than the $200,000 policy limit—the Bramletts did not have standing to sue MedPro for a verdict above the policy limit, and, regardless, a jury had not yet returned any such verdict. MedPro's litigation attorney agreed with this assessment, noting that the Bramletts' *Stowers* claim was "relatively weak" and that settling with them could set a bad precedent for similar cases.

In August 2005, the case proceeded to trial. According to Mr. Davidson, prior to trial, the Bramletts dropped their settlement demand to $1 million, and on the day before trial dropped it to $500,000. The demand went back up to $1 million once trial began. MedPro rejected the offer, counteroffering only the policy limit of $200,000, and possibly some litigation costs.

The trial went as predicted, but the verdict was significantly higher than anticipated. The jury sided with the Bramletts and returned a $14 million verdict—$11 million in actual

damages and $3 million in punitive damages.[1] According to Dr. Phillips's counsel, at the time, this verdict represented the largest medical negligence verdict ever awarded in Lubbock County, Texas.

After trial, additional counsel for Dr. Phillips wrote to MedPro, asserting that, per *Stowers*, a reasonable and prudent insurer would have settled the case for the $200,000 policy limit when the Bramletts so demanded. Counsel threatened that if MedPro did not agree to indemnify Dr. Phillips from liability for the verdict, Dr. Phillips would explore other options, including assigning his *Stowers* claim to the Bramletts. MedPro agreed to indemnify Dr. Phillips and appealed the verdict.

In March 2007, the Court of Appeals of Texas affirmed the case in part, reversing the finding of gross negligence and related punitive damages and holding that Mrs. Bramlett's sons should make a remittitur of $220,000. *Phillips v. Bramlett*, 258 S.W.3d 158, 183 (Tex. App. 2007). The Supreme Court of Texas, however, held that a statutory cap for physicians applied to limit Dr. Phillips's liability. The court also held for the first time that the Bramletts could pursue a direct claim against MedPro for the amount of the verdict in excess of the statutory cap. *Phillips*, 288 S.W.3d at 882. The court reasoned that, if an insured physician's liability is capped, he may not be incentivized "to enforce the insurer's duty to settle with reasonable care." *Id.* Thus, the court held that third parties,

---

[1] The trial court later entered a judgment awarding the Bramletts $9,196,364.50 in actual damages and $2,972,000 in punitive damages, which accounted for prejudgment interest and the hospital's settlement. *Phillips v. Bramlett*, 258 S.W.3d 158, 164 & n.3 (Tex. App. 2007).

such as the Bramletts, can step "in[to] the shoes" of the insured physician and sue the insurer directly under a theory of *Stowers* liability for the insurer's failure to settle. *Id.*

Per its indemnity agreement with Dr. Phillips, MedPro paid the Bramletts approximately $1.7 million—the sum for which Dr. Phillips was liable under the statutory cap. The Bramletts then sued MedPro for the excess verdict. MedPro moved for summary judgment, and the district court denied the motion, partially on the grounds that a genuine issue of material fact existed as to whether a reasonable insurer would have accepted the Bramletts' *Stowers* demands. Before trial, MedPro settled with the Bramletts for a confidential amount greater than $5 million.

## B. MedPro's AISLIC Policies

In the midst of the Bramlett-Phillips lawsuit, MedPro purchased a $5 million Insurance Company's Professional Liability Insurance policy with AISLIC. The policy insured MedPro for certain claims made against it. MedPro's first policy with AISLIC became effective on June 30, 2005, about a year and a half after the Bramletts' first *Stowers* demand and nearly two months prior to the Bramletts' trial against Dr. Phillips. MedPro entered into a renewal policy with AISLIC, effective July 1, 2006, while the appeal of the Bramlett-Phillips lawsuit was pending in the Court of Appeals of Texas. The 2006 Policy application included questions about whether claims or allegations had been made against MedPro in the previous five years, but at MedPro's request, AISLIC deleted these questions, because they were not applicable to a renewal application. That policy expired on July 1, 2007.

Because this case turns on the details of the 2006 Policy, we recite its relevant provisions here. The 2006 Policy included a preamble stating:

> Except to such extent as may otherwise be provided herein, the coverage of this policy is limited generally to liability for only those claims that are first made against the insured and reported in writing to the company while the policy is in force.

The 2006 Policy provided that AISLIC agreed:

> To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Insured and reported in writing to the Company during the Policy Period for any Wrongful Act of the Insured … , but only if such Wrongful Act occurs prior to the end of the Policy Period and occurs solely in the rendering of or failure to render Professional Service.

Finally, and importantly, the 2006 Policy also included Exclusion M, which excluded from coverage:

> … any claim arising out of any Wrongful Act occurring prior to the inception date of the first Insurance Company's Professional Liability Insurance policy issued by the Company to the Insured … , if on such first inception date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a claim or suit.

The 2006 Policy defined a Wrongful Act as "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted."

## C. The MedPro-AISLIC Lawsuit

On June 28, 2007, just three days before the 2006 Policy expired, MedPro notified AISLIC of the Bramlett lawsuit, describing it as a "Potential Claim."

Ultimately, AISLIC refused to cover MedPro's extra-contractual settlement with the Bramletts, leading MedPro to sue AISLIC for breach of contract. The parties cross-moved for summary judgment, and the district court granted summary judgment for AISLIC. The district court concluded that Exclusion M of the 2006 Policy excluded coverage because, as of June 30, 2005, when MedPro first contracted with AISLIC, MedPro knew or should have foreseen that its failure to settle with the Bramletts could lead to a claim or suit. MedPro appeals.

## II. Discussion

We review *de novo* the district court's grant of summary judgment to AISLIC. "Summary judgment is appropriate when there is no genuine dispute as to a material fact." *Estate of Jones v. Children's Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018). "A genuine dispute as to any material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When reviewing cross-motions for summary judgment, "we construe all inferences in favor of the party against whom the motion under consideration is made." *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). Thus, we will "view the facts in the light most favorable" to MedPro and construe

all reasonable inferences in its favor. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Anderson*, 477 U.S. at 255).

Our jurisdiction in this case is based on the parties' diversity of citizenship—MedPro is an Indiana Corporation with its principal place of business in Indiana, and AISLIC is an Illinois corporation with its principal place of business in New York. The amount in controversy exceeds $75,000. 28 U.S.C. § 1332. When sitting in diversity, we apply state substantive law. *Reynolds v. Lyman*, 903 F.3d 693, 695 (7th Cir. 2018) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). We will not address a conflict of law issue unless there is a dispute as to which state's law applies. If neither party disputes the issue, we will apply the law of the state in which the federal court sits. *Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, 712 F.3d 336, 341 (7th Cir. 2013) (citing *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587 n.1 (7th Cir. 2012)). The parties have applied Indiana law here, and so shall we.

Under Indiana law, the interpretation of an insurance contract presents a question of law for the court. *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010) (citing *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992)). The court must "first determine whether the policy is clear or ambiguous." *Id.* (citing *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008)). If the language of the policy is unambiguous, we will apply its plain meaning. If the language of the policy is ambiguous, the court should interpret it in favor of the insured. *Id.* (citing *Tate*, 587 N.E.2d at 668).

## A. Applicability of Exclusion M

We first consider MedPro's argument that the district court improperly granted summary judgment for AISLIC.

The district court reasoned that Exclusion M in the 2006 Policy applied to bar coverage for MedPro's settlement with the Bramletts. [2]

Exclusion M precludes coverage for "any claim arising out of any Wrongful Act" which occurred prior to June 30, 2005, if prior to that date MedPro "knew or could have reasonably foreseen that such Wrongful Act could lead to a claim or suit." Exclusion M creates two questions here: (1) was there a Wrongful Act; and (2) could MedPro have foreseen prior to June 30, 2005 that the Wrongful Act could lead to a claim or suit?

In *Koransky*, we addressed a similar set of facts under Indiana law, and both parties refer to that decision. 712 F.3d 336. The Koransky & Bouwer law firm represented a buyer in a real estate transaction. A firm associate failed to send the executed contract signed by the buyer to the seller, and the seller rescinded its offer to sell. The buyer and seller then entered litigation over the enforceability of the contract. *Id.* at 338–39.

At the same time, Koransky & Bouwer renewed its malpractice insurance. The malpractice policy contained language similar to the 2006 Policy here. The policy "required Koransky & Bouwer to notify [the insurer] during the policy period if, at some point during that policy period, the law firm 'first becomes aware of a specific incident, act or omission while acting in a professional capacity providing Legal

---

[2] The district court disposed of this case without addressing the prerequisite question of whether there was, in fact, coverage under the 2006 Policy, specifically the Special Reporting Clause in Endorsement #16. The parties have not fully developed this issue before us. For the purposes of our analysis, we assume that there was coverage under the 2006 Policy.

Services, which may give rise to a Claim.'" *Id.* at 340. Koransky & Bouwer's policy excluded coverage if "'before the Policy effective date,' the law firm 'knew, or should reasonably have known, of any circumstance, act or omission that might reasonably be expected to be the basis of that Claim.'" *Id.* at 340.

We concluded that, based on the facts, as a matter of law "[a] reasonable attorney in Koransky & Bouwer's position would realize that his client might bring a malpractice claim against him because, as a result of the attorney's mistake, Seller was refusing to complete the negotiated sale." *Id.* at 343. We acknowledged that, at times, it could be difficult to determine exactly which acts or omissions might lead to a malpractice claim, but that the *Koransky* facts did not present one such close call. *Id.* at 343. Because Koransky & Bouwer had notice of a potential malpractice claim prior to entering the insurance contract, the exclusion applied to bar coverage for the malpractice suit.

With *Koransky* and Indiana law in mind, we review *de novo* whether Exclusion M bars coverage under the 2006 Policy.

### 1. The Wrongful Act

As we have noted, Exclusion M excludes coverage for certain "claim[s] arising out of any Wrongful Act." The 2006 Policy defines a "Wrongful Act" as "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted." The parties do not dispute this general definition. They do, however, dispute its application. MedPro argues that to exclude coverage, AISLIC must establish that the claim arose out of an actual Wrongful Act, not merely an *alleged* Wrongful Act. AISLIC takes the

opposite view. Given the plain language of the Exclusion, we agree with MedPro.

AISLIC seeks to bar coverage because the underlying claim asserts a Wrongful Act. But this is not what the plain language of Exclusion M states. It refers only to "any Wrongful Act" rather than a *possible* or *alleged* Wrongful Act. A comparison to *Koransky* aids us in our explanation: the exclusion in *Koransky* referred to "any circumstance, act or omission" that might be the basis of a claim. *Koransky*, 712 F.3d. at 340. AISLIC's policy language is not so broad.

MedPro's interpretation is supported by language elsewhere in the contract. The Special Reporting Clause in Endorsement #16 of the 2006 Policy, for example, refers to a "possible Wrongful Act" and provides coverage if a claim ultimately "aris[es] out of" that act.[3] Under Indiana law, contracts are to be interpreted to harmonize all provisions and not render any words meaningless. *U.S. Bank Tr., N.A. for LSF9 Master Participation Tr. v. Spurgeon*, 99 N.E.3d 671, 675 (Ind. Ct. App. 2018). Interpreting the term Wrongful Act to include alleged or possible Wrongful Acts would render

---

[3] The Special Reporting Clause states:

If during the Policy Period … the CFO, General Counsel or CEO of the Insured shall become aware of any occurrence which may reasonably be expected to give rise to a claim against the Insured for a Wrongful Act which first occurs during or prior to the Policy Period, and provided the Insured gives written notice to the Company during the Policy Period … of the nature of the occurrence and specifics of the possible Wrongful Act, any claim which is subsequently made against the Insured arising out of such Wrongful Act shall be treated as a claim made during the Policy Period.

meaningless the Special Reporting Clause, which specifically provides additional coverage for *possible* Wrongful Acts.[4]

Thus, we interpret Exclusion M to require that AISLIC establish that the claim arose from MedPro's Wrongful Act.[5] *See Berry Plastics Corp. v. Illinois Nat'l Ins. Co.*, 903 F.3d 630, 635 (7th Cir. 2018) (noting that, under Indiana law, "the insurer has the burden of showing that an otherwise-covered claim is barred by an exclusion in the policy"). Viewing the evidence in the light most favorable to MedPro, there is a genuine factual dispute as to whether MedPro committed a Wrongful Act.

MedPro argues that it handled the Bramletts' *Stowers* demands appropriately and that its rejection of the demands was not a Wrongful Act. A reasonable factfinder could agree. Outside counsel believed that MedPro had not acted in bad faith by declining both *Stowers* demands in order to investigate the case, and MedPro's own counsel agreed. Moreover, there is some evidence that the largest medical malpractice

---

[4] Under Indiana law, the interpretation of an ambiguous contract is a question of law for the court. *Trinity Homes*, 629 F.3d at 656. We do not believe the term Wrongful Act as it appears in Exclusion M to be ambiguous. If it were, ambiguities in an insurance contract are to be interpreted in favor of the insured, which would also be consistent with interpreting Wrongful Acts to include only actual, and not merely alleged, Wrongful Acts. *See id.*

[5] MedPro also argues that Exclusion M requires that MedPro subjectively knew it had committed a Wrongful Act. Under Indiana law, contracts are to be given their plain and ordinary meaning. *Trinity Homes*, 629 F.3d at 653. Exclusion M does not include any indication of a subjective standard for a Wrongful Act. It does not state "known Wrongful Act." It does modify the claim or suit as one that must be "reasonably foreseen," but that modifier does not appear to apply to Wrongful Acts.

verdict in the area at that time was $2 million—a similar ver-
dict, or even a larger verdict (up to $2.5 million), would not
lead to extra-contractual liability for MedPro, because the
hospital had already agreed to pay $2.3 million. It was not un-
til after MedPro declined to settle that several people, includ-
ing Dr. Phillips's attorneys and a MedPro claims specialist,
advised that there would be an adverse verdict and it was
likely to be $3 million or over.

To be sure, there is also evidence pointing in the other di-
rection. By the time the Bramletts made their second demand,
MedPro knew of the damaging fact that Dr. Phillips had not
immediately attended to Mrs. Bramlett because he went to ex-
ercise. By that time, the Bramletts had also submitted an ex-
pert report supporting Dr. Phillips's liability for their claim.
In addition, MedPro knew that the hospital had settled for
$2.3 million, presumably because it believed that the verdict
could be adverse and large.

Summary judgment is appropriate only when there is no
dispute of material fact. *Estate of Jones*, 892 F.3d at 923. Given
this genuine dispute of material fact, the district court's grant
of summary judgment in favor of AISLIC was improper.

### 2. Foreseeability of the Bramletts' Claim

If a trier of fact were to find that MedPro committed a
Wrongful Act by failing to settle with the Bramletts, the next
question under Exclusion M is whether, prior to June 30, 2005,
MedPro should have foreseen that the Bramletts could make
a claim arising from MedPro's failure to settle. *Koransky* con-
trols our analysis of whether such a claim was foreseeable.
And, like in *Koransky*, even viewing the facts in the light most
favorable to MedPro, we must conclude as a matter of law

that a reasonable insurer would have foreseen the Bramletts' *Stowers* claim prior to June 30, 2005.[6]

MedPro makes much of the fact that, prior to the Supreme Court of Texas's holding in 2009, it was not clear that the Bramletts had an independent right of action against MedPro to recover an excess verdict. But MedPro overlooks the fact that, under *Stowers*, Dr. Phillips would have had standing to sue MedPro if an excess verdict was rendered against him—a claim Dr. Phillips could have assigned to the Bramletts. In fact, Dr. Phillips, through counsel, eventually threatened to make such an assignment. As long as Dr. Phillips's *Stowers* claim was foreseeable, it was also foreseeable that he could have assigned the claim to the Bramletts.

And Dr. Phillips's *Stowers* claim was, in fact, foreseeable. Two demand letters from Dr. Phillips's attorney stated that an excess verdict was likely and alleged that *Stowers* applied. MedPro acknowledges that it could have considered these letters "a threat of a potential claim by Dr. Phillips … should a final judgment be entered against Dr. Phillips exceeding $2.5 million." Additionally, the MedPro claims specialist who attended the February 2005 mediation advised that an excess verdict was likely and that MedPro was facing *Stowers* problems. Although trial had not yet occurred by June 30, 2005, MedPro was undoubtedly on notice that it could face extra-contractual liability if the jury rendered a large adverse verdict. Even if MedPro did not believe that it would be found liable under *Stowers*, as we stated in *Koransky*, it is irrelevant

---

[6] Again, we express no opinion on when the Bramletts' claim against MedPro was made or whether there was coverage pursuant to the Special Reporting Clause in Endorsement #16.

whether the foreseeable claim would ultimately succeed. It is relevant only that there may be a claim at all. *Koransky*, 712 F.3d at 343.

As a medical malpractice insurer, MedPro may often find it "difficult to determine" which situations will eventually evolve into claims.[7] *Koransky*, 712 F.3d at 343. As in *Koransky*, however, "this case is not a close one." *Id.* The district court correctly determined that, by June 30, 2005, MedPro should have known that it was facing a potential claim.

## B.  Indiana's Known Loss Doctrine

Finally, although the district court did not reach this issue, we briefly address AISLIC's alternative argument that, even if Exclusion M does not apply to bar coverage for MedPro's claim, Indiana's known loss doctrine does.

The known loss doctrine is a common law principle that a party cannot obtain insurance for a loss that has already occurred. *In re Indiana State Fair Litig.*, 49 N.E.3d 545, 549 (Ind. 2016). "[I]f an insured has actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy, the known loss doctrine will bar coverage." *Id.* (quoting *Gen. Housewares Corp. v. Nat'l Sur. Corp.*, 741 N.E.2d 408, 413–14 (Ind. Ct. App. 2000)). A "probability of loss" is not enough for the doctrine to apply. *Gen. Housewares*, 741 N.E.2d at 414. Rather, a substantially

---

[7] Relatedly, MedPro argues that AISLIC agreed to the deletion of questions in the 2006 Policy application because AISLIC recognized that MedPro regularly fielded potential claims and did not mean to include these in Exclusion M. As the district court recognized, the record reflects that these questions were deleted merely because they were not relevant for a renewal application.

certain loss is one that is "virtually inevitable." *Id.* at 414; *compare id*. at 418 (company knew that liability was substantially certain to occur where it knew that it was strictly liable for an environment cleanup, although it did not yet know the cost for that cleanup) *with Meridian Mut. Ins. Co. v. Majestic Block & Supply, Inc.*, 1 N.E.3d 173, 178–79 (Ind. Ct. App. 2013) (no substantial certainty where company knew that there was possible contamination on its site, but test results had not yet confirmed that contamination).

When MedPro first contracted with AISLIC, the Bramlett-Phillips trial had not yet occurred, and no adverse or excess verdict had been rendered. Additionally, as we have discussed, it was unclear prior to June 30, 2005, as it remains today, whether MedPro is liable under *Stowers*. For these reasons, we cannot say that MedPro was facing a "virtually inevitable" loss prior to contracting with AISLIC, and therefore, the known loss doctrine does not apply.

### III. Conclusion

The district court correctly determined that summary judgment was appropriate on the question of whether the Bramletts' claim was reasonably foreseeable. We conclude, however, that there is a genuine dispute of material fact as to whether MedPro committed a Wrongful Act so as to negate coverage. For these reasons, we AFFIRM in part and REVERSE and REMAND in part for further proceedings consistent with this opinion.