In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 18-3205

MILWAUKEE CENTER FOR
INDEPENDENCE, INC.,

*Plaintiff-Appellee,*

*v.*

MILWAUKEE HEALTH CARE,
LLC, agent of Wellspring of
Milwaukee, *et al.*,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 15-CV-1479 — **Lynn Adelman**, *Judge.*

_____

ARGUED APRIL 10, 2019 — DECIDED JULY 8, 2019

_____

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Milwaukee Health Care, LLC
(MHC) and Milwaukee Center for Independence, Inc. (MCFI)
entered into an agreement in 2014. Per that agreement, MCFI,
a non-profit organization dedicated to providing medical care

for individuals with brain injuries, would operate a brain-injury center in MHC's nursing facility. MHC would handle all billing and collections for the services MCFI provided and, through a process outlined in the agreement, remit the funds collected to MCFI (after taking a cut for itself).

But MHC failed to follow through on its obligations under the contract, redirecting MCFI's funds to pay its employees and other creditors instead. MCFI sued MHC for breaching the contract and brought claims against MHC's principal, William Nicholson. The district court, exercising diversity jurisdiction,[1] entered summary judgment against MHC for breach of contract and against Nicholson for conversion and civil theft. The district court awarded MCFI over $2 million in damages, interest, and costs against MHC and Nicholson, jointly and severally. It also awarded MCFI over $200,000 in attorney's fees and costs against Nicholson alone.

MHC and Nicholson appeal the judgments against Nicholson. Because we agree with the conclusions of the district court, we affirm.

## I.

William Nicholson was the CEO of "the Congress Companies," a collection of businesses involved in the construction of medical facilities. In 2013, Nicholson and another investor,

---

[1] See 28 U.S.C. § 1332. MCFI is a Wisconsin corporation with its principal place of business in Wisconsin. MHC is a Delaware LLC whose members, William Koski and William Nicholson, are both citizens of New Jersey. *See generally Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998) ("[T]he citizenship of an LLC for purposes of the diversity jurisdiction is the citizenship of its members."). The amount in controversy well exceeds $75,000.

William Koski,[2] formed MHC to operate the Wellspring of
Milwaukee nursing home, with Nicholson serving as the
managing member. The Wellspring facility was in a building
owned by Milwaukee Healthcare Properties I, LLC (Milwau-
kee Properties), another of Nicholson's companies. The prop-
erty was subject to a mortgage from Oppenheimer Multifam-
ily Housing and Healthcare Finance, Inc. (Oppenheimer).
The United States Department of Housing and Urban Devel-
opment (HUD) insured the mortgage.

In 2014, MCFI and MHC entered into an agreement
whereby MCFI would operate an 18-bed brain-injury clinic
within the Wellspring facility, the Nexday Brain Injury Rehab
Center (BIRC). The agreement outlined a specific process for
MCFI to obtain compensation for services performed at the
BIRC. MHC would bill and collect from third parties (e.g.,
Medicaid and private insurance companies) for MCFI's ser-
vices in MHC's own name and on MHC's own behalf. MHC
would then place any funds collected for MCFI's services
(BIRC Collections) into a general account, which was subject
to a control agreement with Branch Banking & Trust Com-
pany. The agreement then required MHC to maintain a spe-
cial checking account with a Milwaukee-area bank (the BIRC
Depository Account) and transfer all BIRC Collections into
that account. On the third business day of every month, MCFI
would submit an invoice to MHC. On the 20th of each month,
MHC would remit to MCFI either the amount of the invoice
or the amount in the BIRC Depository Account, whichever

---

[2] Koski was originally a party to this suit along with Nicholson, but
after the district court dismissed the claims against them in MCFI's First
Amended Complaint, MCFI did not name Koski as a defendant in its
Second Amended Complaint.

was less, after taking a cut for itself (the "Wellspring Interim Daily Rate").[3]

In addition to these terms, the agreement called for MHC to approach Oppenheimer and HUD about approval for MCFI to acquire a security interest in the receivables of which the BIRC Collections would be proceeds. The agreement notes any such interest would be subordinate to any security interest held by Oppenheimer, HUD, or an accounts-receivable lender. The parties do not indicate what Oppenheimer and HUD thought about MCFI acquiring a security interest in those receivables, but it is clear MCFI never got one.

In 2015, the parties entered into a renewal agreement containing substantially similar terms.

While the parties operated under these agreements, MHC suffered significant cash-flow problems. MHC's financial woes prompted Nicholson to invest his personal funds multiple times, totaling over $4 million. In an effort to manage these problems, Nicholson directed the CFO of the Congress Companies, Ed Tabor, to get involved to "help manage the cash."

Under Tabor's direction, MHC began redirecting BIRC Collections to make its payroll and pay other creditors, primarily Milwaukee Properties. In 2015, MHC entered into a line-of-credit arrangement with SCM Specialty Finance Opportunities Fund, L.P. (SCM), an accounts-receivable lender. Under that agreement, MHC placed all the money it collected

---

[3] This round-about way for MCFI to receive its compensation was apparently a consequence of Wisconsin law, which did not allow MCFI to bill in its own name.

(including BIRC Collections) into one of two lock-box accounts (one for government payors, the other for private payors). Every day, SCM would sweep out all the funds in those accounts and apply them toward MHC's outstanding debt to SCM. MHC would then request a new draw on the line of credit to obtain operating capital.

MCFI received its last full payment from MHC in March 2015. By the end of that year, MHC owed MCFI over $1 million.

MCFI sued MHC in December 2015 and ceased operating the BIRC in February 2016. In its operative complaint, MCFI claimed MHC breached the contract and sought to hold Nicholson liable under theories of veil-piercing (to hold him personally liable for MHC's breach), conversion, and civil theft. MCFI maintained Tabor was Nicholson's agent, so Nicholson was personally responsible for Tabor's redirection of the BIRC Collections.

MHC acknowledged it breached the contract, but Nicholson contested his personal liability. The parties filed cross-motions for summary judgment. In his briefs to the district court, Nicholson argued (1) MCFI could not pierce the LLC's veil, (2) MCFI's claims for conversion and civil theft amounted to an impermissible claim for tortious breach of contract, and (3) MCFI was just another vendor with no particular interest in the BIRC Collections. However, concerning his relationship with Tabor, Nicholson "concede[d] that Nicholson was principal, and Tabor was Nicholson's agent."[4]

---

[4] Defendants' Response to Motion for Summary Judgment, Doc. 73, at 23.

Yet, he maintained nothing either he or Tabor did amounted to a conversion of the BIRC Collections.

The district court entered summary judgment for MCFI on its claims for breach of contract, conversion, and civil theft. After noting Nicholson's concession of his agency relationship with Tabor, the district court observed Nicholson's only defense against MCFI's tort claims was his argument MCFI had no interest in the BIRC Collections. The district court concluded MCFI had such an interest, and therefore held Nicholson liable for conversion and civil theft. The district court also held MCFI's tort claims were not improperly conflated with a claim for breach of contract.

The parties submitted additional briefing on damages. In his damages brief, Nicholson tried to walk back his earlier concession concerning his relationship with Tabor, arguing he meant to say he was Tabor's principal inasmuch as he was Tabor's superior within MHC, not that Tabor was his *personal* agent. The district court rejected that argument outright and held Nicholson to his concession. The court awarded MCFI $1,903,452.47, plus interest and costs, against Nicholson and MHC jointly and severally. It also awarded $198,669.50 in attorney's fees, plus costs, against Nicholson alone.[5]

## II.

We review the grant of summary judgment *de novo*. *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). "When

---

[5] The district court also awarded MCFI $33,362.66, plus interest, against MHC for unreimbursed improvements MCFI had made to the Wellspring facility.

reviewing cross-motions for summary judgment, 'we con-
strue all inferences in favor of the party against whom the mo-
tion under consideration is made,'" that is, the party appeal-
ing the judgment. *Med. Protective Co. of Fort Wayne v. Am. Int'l
Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018) (quot-
ing *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir.
2018)). "Summary judgment is appropriate … if, on the evi-
dence provided, no reasonable juror could return a verdict in
favor of" that party. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir.
2013). Because this is a diversity case, "we apply state sub-
stantive law." *Med. Protective Co.*, 911 F.3d at 445. Specifically,
we apply Wisconsin law because this case comes to us from
the Eastern District of Wisconsin and neither party disputes
that Wisconsin law applies. *See id.*

**A. Waiver & Concession**

Before getting to the merits of this case, we note Nicholson
makes a number of arguments in his briefs to this court that,
as MCFI points out, were not raised to the district court.
Those arguments are waived, and we will not address them.
*See Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018)
("Failing to bring an argument to the district court means that
you waive that argument on appeal.").

In addition, Nicholson spends a significant portion of his
brief arguing about his relationship with Tabor. Nicholson
tells us Tabor and he were co-agents, going so far as to argue
he was not Tabor's principal at all.[6] But all of that is moot

---

[6] "In a relationship of coagency, neither agent is the other's agent.
Thus, neither is vicariously liable for wrongs committed by the other.
Each coagent owes duties to the common principal." Restatement (Third)

given Nicholson's express concession in his briefing to the district court "that Nicholson was principal, and Tabor was Nicholson's agent."   Nicholson is bound to his admission, however much he regrets it now.  *Cf. Soo Line R.R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) ("[J]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible.").  The manner of Nicholson's concession bolsters that conclusion.  Nicholson did not just concede his relationship with Tabor in some throw-away line buried in the brief.  He expressly stated, at the end of the section of his brief discussing conversion, that though he was Tabor's principal and Tabor was his agent, it did not matter because MCFI had no interest in the BIRC Collections. Nowhere in the three briefs Nicholson filed with the district court before the damages phase does Nicholson argue he is not personally liable because he had an insufficient relationship with Tabor.  Thus, Nicholson cannot argue this is just "a new twist" on an earlier argument.  *Cf. United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008) (concluding the appellant's reliance on different authority on appeal was not a new argument).  This is a blatant attempt to contradict what he already admitted, and we will not allow it.

**B. Nicholson's Remaining Arguments**

Setting aside the arguments Nicholson conceded or did not develop before the district court, we are left with two: (1) MCFI cannot pursue its claims for conversion and civil theft

---

of Agency § 1.04 cmt a. Nicholson argues the "common principal" was MHC.

because it did not have an ownership interest in the BIRC Collections, and (2) MCFI's tort claims are simply repackaged claims for breach of contract. We take each in turn.

*1. MCFI's Ownership Interest*

Under Wisconsin law, both conversion and civil theft require the victim to have an ownership interest in the property converted or stolen. WIS. STAT. § 895.446(1) (creating a civil cause of action for victims of theft); WIS. STAT. § 943.20(1)(b) (defining theft to include the intentional use, transfer, concealment, or retention of possession of money "without the owner's consent, contrary to his or her authority, and with intent to convert … to the use of any other person except the owner"); *H.A. Friend & Co. v. Prof'l Stationery, Inc.*, 720 N.W.2d 96, 100 (Wis. Ct. App. 2006) (listing "intentional control or taking of property belonging to another" as the first element of conversion). Nicholson argues MCFI did not have such an interest in the BIRC Collections; it merely had a right to payment. *See generally Kentuckiana Healthcare, Inc. v. Fourth St. Solutions, LLC*, 517 F.3d 446, 447 (7th Cir. 2008) ("If you simply owe someone money and fail to pay it, you have broken a contract but you have not taken your creditor's property."). He notes MHC billed and collected in its own name and on its own behalf, the BIRC Collections were held in MHC's bank accounts, and MCFI acknowledged other entities could claim security interests in the BIRC Collections. All of this, he says, shows MCFI did not have an ownership interest in the BIRC Collections. We disagree. [7]

---

[7] In a related argument, Nicholson contends the BIRC Collections cannot be subject to a claim for conversion because they were commingled with other funds in MHC's accounts. In his briefing to the district

Our analysis on this point begins, and just about ends, with *Methodist Manor of Waukesha, Inc. v. Martin*, 647 N.W.2d 409 (Wis. Ct. App. 2002). In that case, Evelyn Martin was a resident at a Methodist Manor nursing home. *Id.* at 410.[8] Her son, Frederick Martin, was a joint holder on her bank account and would receive "on his mother's behalf her monthly income from Social Security and other unknown sources." *Id.* at 411 (internal quotation marks omitted). Wisconsin law and Evelyn's contract with Methodist Manor required Evelyn to pay all but $40 of her monthly Social Security income to Methodist Manor on the 15th of each month. *Id.* at 411 & n.1; *see also* WIS. STAT. § 49.45(7)(a) (1999–2000). Nevertheless, Frederick did not forward his mother's Social Security income to Methodist Manor, instead using the funds "for himself or others." *Martin*, 647 N.W.2d at 411.

---

court, Nicholson's only argument about commingling in relation to the tort claims was one sentence in a paragraph asserting MHC was not MCFI's "fiduciary or trustee" for the purposes of MCFI's civil-theft claim. Whether that was sufficient to avoid waiver of the argument he makes here is immaterial because the argument fails in any event. Just because money was "mingled" with other money does not defeat a claim for conversion. *See Regas v. Helios*, 186 N.W. 165, 166 (Wis. 1922) (allowing a claim for conversion where the defendant "proceeded to treat the money as his own by mingling it with his own funds"); *Cotton v. Sharpstein*, 14 Wis. 226, 234 (1861) ("[W]hen [the defendant] so mingles [money] without authority and then refuses to pay, I am unable to see why such refusal should not be just as much evidence of a conversion as though the money were still in a separate parcel.").

[8] *Martin* was an appeal from a motion to dismiss, so the Wisconsin Court of Appeals treated the facts alleged in the complaint as true. 647 N.W.2d at 410.

Methodist Manor sued Frederick for conversion. *Id.* The
trial court dismissed the complaint, but the Wisconsin Court
of Appeals reversed. The court concluded Methodist Manor,
pursuant to the law and its contract with Evelyn, was "the one
rightfully entitled" to the Social Security income. *Id.* at 412
(internal quotation marks omitted). Therefore, Frederick was
"under a duty to remit [the Social Security income] to Meth-
odist Manor," and his failure to do so amounted to a conver-
sion of Methodist Manor's property. *Id.* (internal quotation
marks omitted).

Drawing out the similarities between the case before us
and *Martin* defeats most of Nicholson's arguments. Nichol-
son says MCFI cannot have an ownership interest in the BIRC
Collections because MHC acquired them in its own name and
on its own behalf. But that was just as true of Evelyn Martin
receiving her Social Security income in her own name and on
her own behalf. Nicholson says MHC owned the BIRC De-
pository Account where the BIRC Collections were stored be-
fore being remitted to MCFI, but the Social Security income in
*Martin* presumably was also held in the Martins' bank ac-
count until it was turned over to Methodist Manor. At bot-
tom, the cases are materially indistinguishable. Both in *Mar-
tin* and here, one party received funds from an outside source
and was required to remit those funds to the other party. If
that was enough to create an ownership interest in *Martin*, it
is enough here.

Despite the evident similarities between this case and *Mar-
tin*, Nicholson fights the analogy, pointing instead to *Method-
ist Manor Health Center, Inc. v. Py*, 746 N.W.2d 824 (Wis. Ct.
App. 2008). Ruth Ann Py was another resident at a Methodist
Manor nursing home. *Id.* at 826. According to the terms of

her contract, Py was to pay Methodist Manor $2,450 each month. *Id.* Py's granddaughter, Nadine Ray, had control of Py's checkbook and handled her accounts. *Id.* at 827. At Py's request, Ray would deliver large amounts of cash to her grandmother ranging from $500 to $5,000. *Id.* Meanwhile, Py allegedly became deficient in her payments to Methodist Manor, accruing an outstanding balance of $32,700. *Id.* at 826–27.

The Wisconsin Court of Appeals held Methodist Manor did not have a claim for conversion against Ray. The court considered *Martin* "inapposite" because "there [was] no evidence … that Ray received funds that were to be applied to the cost of Py's care." *Id.* at 828. Unlike the situation in *Martin*, there was no evidence Methodist Manor was entitled to any specific money in Py's accounts; it merely had a right to payment. *See id.* at 830 (citing approvingly the trial court's conclusion "Ruth Ann Py owed money to Methodist Manor for what Methodist Manor provided [her] with" but the money was Py's).

The facts of this case are much closer to *Martin* than they are to *Py*. Here, MCFI had more than a generic right to payment; the agreements entitled MCFI to specific funds MHC collected for services at the BIRC. Indeed, the parties point to no provision in the agreements under which MCFI could receive *any* funds MHC collected unrelated to the BIRC. Under the reasoning of *Martin*, MCFI had an ownership interest in the BIRC Collections.

We address one other argument Nicholson makes relating to MCFI's ownership interest: MCFI could not have a property interest in the BIRC Collections because it acknowledged the receivables from the BIRC, of which the BIRC Collections

would be proceeds, could be subject to security interests held by MHC's creditors, including MCFI itself. *See generally* WIS. STAT. § 409.203(6) ("The attachment of a security interest in collateral gives the secured party the rights to proceeds provided by s. 409.315 … ."); WIS. STAT. § 409.315(1)(b) ("A security interest attaches to any identifiable proceeds of collateral."). Nicholson points to Wisconsin law that an enforceable security interest requires the party granting the interest to have "rights in the collateral or the power to transfer rights in the collateral." WIS. STAT. § 409.203(2)(b). He argues if the BIRC Collections were MCFI's property, MHC would not have been able to grant security interests in the receivables.

We are unconvinced. Just because MCFI gave the impression MHC could grant security interests in the receivables does not mean MCFI did not have an ownership interest in the BIRC Collections. If the true owner of property gives the impression that another is the owner, the true owner cannot later contest a security interest the other granted in the property. *See Kloety v. Delles*, 45 Wis. 484, 488–89 (Wis. 1878); 68 Am. Jur. 2d Secured Transactions § 203. However, nothing in that rule serves to negate the true owner's rights in the property—he is just "estopped from showing that a security interest is not valid." 68 Am. Jur. 2d, *supra.* Therefore, at most MCFI's acknowledgement of the security interests of MHC's creditors only estops MCFI from contesting the interests of those creditors. It does not prevent MCFI from asserting its ownership of the property against MHC. *See Kloety*, 45 Wis. at 489 ("Under these circumstances, we think the plaintiff is estopped to deny *as against [the secured party]* that his wife is the owner of the property." (emphasis added)).

*2. Contract and Tort*

This leaves only Nicholson's argument that he is not sub-
ject to the tort claims because they conflate tort and contract.
In that regard, "Wisconsin has a long history of attempting to
maintain the distinction between contract and tort claims."
*Butler v. Advanced Drainage Sys., Inc.*, 717 N.W.2d 760, 773
(Wis. 2006) (Roggensack, J., concurring). But maintaining that
distinction does not preclude the bringing of a tort claim
every time there is a contract between the victim and the tort-
feasor. *See Cotton v. Sharpstein*, 14 Wis. 226, 228 (1861). Wis-
consin courts only require "a duty existing independently of
the performance of the contract for a cause of action in tort to
exist." *Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147,
151 (Wis. 1992) (quoting *Landwehr v. Citizens Trust Co.*, 329
N.W.2d 411, 414 (Wis. 1983)); *accord Cotton*, 14 Wis. at 229
("[A] party, by entering into a contract with the owner in re-
spect to property, does not thereby incapacitate himself from
wrongfully invading the rights of the owner which exist inde-
pendent of the contract."). To proceed on a tort claim when
there is a contract, "*a contract may create the state of things* which
furnishes the occasion of a tort"; it just cannot create "the un-
derlying duty for the tort." *Landwehr*, 329 N.W.2d at 414
(quoting *Colton v. Foulkes*, 47 N.W.2d 901, 903 (Wis. 1951)).

As the district court concluded, the contract between the
parties here "created the state of things" which allowed the
tort to occur; it did not create the duty Nicholson breached.
By the terms of the parties' agreement, MCFI obtained an
ownership interest in the BIRC Collections. The duty to re-
frain from converting or stealing the BIRC Collections was en-
tirely independent of the contract. It arose from the common
law and Wisconsin statutes, not the contract between MCFI

and MHC. *See Atkinson v. Everbrite, Inc.*, 592 N.W.2d 299, 301–02 (Wis. Ct. App. 1999) ("[T]ort obligations are in general obligations [that are] imposed by law … to avoid injury to others." (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 92 (5th ed. 1984))). Accordingly, the presence of a contract between MCFI and MHC does not bar holding Nicholson liable for the torts. *Cf. H.A. Friend & Co.*, 720 N.W.2d at 102 ("Van Der Puy had a duty, regardless of the existence of the contract, not to retain or use money that belonged to Friend without Friend's consent or authorization.").

## III.

MCFI had an ownership interest in the BIRC Collections and was entitled to proceed on its tort claims against Nicholson, who was personally involved in the wrongful redirection of those funds through the actions of his agent, Tabor. The district court's grant of summary judgment to MCFI is AFFIRMED.